IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-02670-MEH

KATHERINE WASHINGTON,

     Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of the Social Security Administration,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

     Plaintiff Katherine Washington appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), originally filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of the appeal. After consideration of the parties' briefs and the administrative record, the Court affirms in part and reverses in part the ALJ's decision, and remands the matter to the Commissioner for further consideration.

## **BACKGROUND**

### I.    **Procedural History**

     Plaintiff seeks judicial review of the Commissioner's decision denying her application for

DIB filed on November 10, 2015. Administrative Record ("AR") 221-222. After the application was denied on February 25, 2016 (AR 67-72), an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for August 29, 2017 (AR 115-166), at which Plaintiff was represented by counsel, and the Plaintiff and a vocational expert appeared. AR 60-66. The ALJ determined that, because the medical expert was unable to testify due to severe flooding in Houston, she would need to reschedule the hearing to a later date. *Id.* The hearing was rescheduled to December 4, 2017, at which Plaintiff was represented by counsel, and the Plaintiff, the medical expert, and a vocational expert testified. AR 31-59. The ALJ issued a written ruling on December 18, 2017 finding Plaintiff was not disabled starting on December 20, 2000 through December 31, 2005 because, considering Plaintiff's age, experience, and residual functional capacity, Plaintiff could successfully adjust to other work existing in significant numbers in the national economy. AR 12-25. On September 21, 2018, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. AR 1-6. *See* 20 C.F.R. § 404.981. Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.     Plaintiff's Alleged Conditions

Plaintiff was born on December 12, 1973; she was forty-one years old when she filed her application for DIB on November 10, 2015. AR 221. Plaintiff claims she became disabled on December 20, 2000 [*id.*] and reported that she was limited in her ability to work due to "PTSD [post-traumatic stress disorder], lumbar [strain], headaches, leg, shoulder, feet, hands." AR 67-68. On August 23, 2017, Plaintiff provided a report of her diagnoses, symptoms, and medications, in which

she reported she has been diagnosed with sarcoidosis (stage 2), cranial nerve palsy, seizure disorder, osteoarthritis, chronic migraines from traumatic brain injury, white brain matter disease, ganglion cyst formation (right hand), right ACL sprain, sleep apnea, minimal diverticulosis, hand tremors, pancreatic duct stones, anemia, partial amputation of right distal phalange, acquired spinal stenosis, lower extremity numbness, digestive symptoms (post Cholecystectomy), PTSD, and bipolar I disorder. AR 269-279.

No party disputes that Plaintiff's "date last insured" for purposes of social security benefits was December 31, 2005; thus, the Plaintiff must establish a "disability" on or before that date to be entitled to a period of disability and disability insurance benefits. Plaintiff contends that she was (and has been) disabled since December 20, 2000; the medical record presented in this case dates back to 1999 and is more than 2,500 pages in length. Therefore, in describing Plaintiff's medical history, the Court will focus primarily on those records cited by the parties and the ALJ in this case.

On January 14, 1999, Sherrie Somers, M.D. issued a report following a Compensation and Pension ("C&P") Examination she conducted of the Plaintiff purportedly to determine whether Plaintiff was entitled to benefits from the Veterans Administration. AR 323-331. Dr. Somers diagnosed Plaintiff with lumbosacral strain, bilateral hip strain, migraine headaches ("fairly well controlled on Midrin"), and lower extremity limited range of motion "secondary" to lumbosacral strain (AR 328), all arising from Plaintiff's fall from the back of an ambulance in June 1997 during her military service (AR 323). Thereafter, Plaintiff presented on May 11, 2000 "to establish PCP" and was seen by Eric Rodgers, NP, who referred her to the "rehabilitation" department. AR 344-347. On May 24, 2000, Plaintiff presented to Nancy Cutter, M.D. in "rehab," who "order[ed] MRI

and EMG to rule out radiculopathy" for the back pain and "plan[ned] neurology consult" for the headaches. AR 344.

On August 22, 2000, Plaintiff underwent another C&P examination with Genet D'Arcy, M.D., who reported that Plaintiff left the military in October 1998 due to her back condition, for which Plaintiff was sent to Walter Reed Hospital and underwent several months of physical therapy. Plaintiff reported that she experienced "pain most days" during which she would need to lie down for an hour or two; once per month or once every other month, she could not get out of bed; she could not sit for more than 30-45 minutes, ride in a car more than fifteen minutes, and stand more than twenty minutes, and she used a "Canadian crutch" to ambulate on walks longer than five minutes; her sleep was interrupted by pain and she rarely took her medications because they "ma[d]e her very sleepy"; she lived with her elderly mother and did some minimal housework, but nothing strenuous; she experienced some minimal urinary incontinence, weakness in her legs, and numbness in her right buttocks, right hand, and right foot; she carried groceries up to a quart of milk and friends at school carried her books; she engaged in exercise by walking, swimming, and biking (stationary) for a total of fifteen minutes; and, she experienced minor headaches twice a week and "intense" headaches two or three times per month which lasted approximately four hours and caused her to feel dizzy and nauseous. AR 334-337; 1375-1379. Noting that she did not have access to prior medical records, Dr. D'Arcy diagnosed Plaintiff with lumbar strain and migraine headaches. AR 337. On October 13, 2000, Dr. D'Arcy noted (by hand) that she reviewed Plaintiff's chart (but "could not locate MRI results"), and found it consistent with Plaintiff's reported history. AR 333. She also noted that "Veteran is unemployable. Her ability to walk, stand, sit, carry, lie down etc. is

4

all severely limited to the extent to preclude employment. The lumbosacral problems are the cause of this severe functional limitation." *Id.*

During the following year, Plaintiff did not "show" for an "EMG consult" on August 28, 2000 nor for a "neurology consult" on July 6, 2001. AR 1374. Plaintiff attended an "annual" gynecological examination on August 22, 2001, at which she reported that she had experienced a "back injury" and "migraines," but was "otherwise healthy," and that she exercised by "tread[ing] water - 3 x week"; the provider noted that Plaintiff appeared "fit" and "did feel some feel some depression with her mom's death." AR 1370. The next record reflects that Plaintiff presented to Meletios J. Fotinos, M.D. on November 5, 2002 asserting that she wished "to quit smoking." AR 1366-1367. Plaintiff reported to Dr. Fotinos that she experienced a chronic pain disorder in her low back and that she had no history of psychiatric disorders, such as PTSD, Bipolar Disorder, Major Depression, or Anxiety Disorder. AR 1368. In February 2003, Plaintiff attended a gynecological examination (AR 1361-1363) and in June 2003, Plaintiff presented to NP Rodgers for low TSH result; TSH test was normal that day and there was no report of "functional limitations." AR 1357-1359. She also presented to NP Rodgers in December 2003 for suspected "influenza." AR 1353-1354. In 2004, Plaintiff attended an "annual" gynecological examination in June, at which she reported a "back injury" and "migraines" but she was "otherwise healthy" and her depression screen was negative. AR 1349-1351.

In 2005, Plaintiff presented for an annual "well woman examination" in March and reported that, for exercise, she was walking and treading water three times weekly. AR 1343-1347. On May 4, 2005, Plaintiff presented to Bonnie Brooks, M.D., who noted Plaintiff "transfer[red] from Eric

Rodgers, NP, last seen 12/2003." Plaintiff reported that she was experiencing "severe migraines. Fell, hit head with headache 3 weeks ago" and felt "vision changes, " "nausea," and like "her head is going to explode"; "has back pain, usually around migraines . . . may be related to fall 3 weeks ago"; she "exercises/ swimming/yoga"; she was experiencing daily diarrhea and pain in her left knee following her fall in April 2005. AR 1337-1342. At a follow-up appointment on June 13, 2005, Plaintiff reported that her left knee was "improving" and Plaintiff's screenings for PTSD and depression were negative. AR 1331-1336. On June 22, 2005, Dr. Brooks noted that she reviewed Plaintiff's "labs," which were "overall much better." AR 1331. On November 17, 2005, Plaintiff "followed-up" with Dr. Brooks at which time she reported she was "very stressed, maybe depressed," and that she was going to "graduate from college this winter, then take MCAT this spring." AR 1320-1326. Plaintiff also reported that her "appetite [was] good"; she was "exercising on campus, feels she could exercise more"; her "left knee [was] 'ok'"; she was "sleeping thru migraine headaches - feels ok about this also"; and, the diarrhea "resolved on [its] own with diet changes." *Id.*

On July 19, 2017, Plaintiff presented to Max Wachtel, Ph.D. for a psychological evaluation at the request of her legal counsel. *See* AR 2583-2596. With respect to the time period at issue here, Plaintiff reported to Dr. Wachtel that she was gang raped in high school and raped while in military service, and "has had significant issues with depression, mania, and PTSD since these two traumatic events." AR 2587-2588. She also reported that she worked for approximately four years before joining the Army, where she "wanted to stay . . . for 20 years," but "'that didn't work out' because of the traumatic rape." AR 2588; *see also* AR 2590 (Plaintiff "wanted to stay in the military for 20

years and loved her time in the service until she was raped by a fellow military member."). She also said "she had significant problems with maintaining employment because of her mental health issues" and "she tried to obtain and keep jobs after her college graduations . . . but was unable to do so because of her severe mental health issues." *Id.* Plaintiff reported that she had a "caregiver because she falls frequently and has numerous migraines and seizures from a traumatic brain injury she sustained in the Army." AR 2589. Plaintiff "indicated that she has significant physical health problems, including a traumatic brain injury from the Army, migraines, back problems, chronic pain, and seizures." AR 2590. She reported that she "attempted to work in biology laboratories after 2000 but has struggled to maintain employment because of her mental health symptoms." *Id.* Dr. Wachtel diagnosed Plaintiff with PTSD and Bipolar Disorder, and opined that Plaintiff's condition "began in her teen years when she experienced her first trauma. Her mental state deteriorated over time, and the condition became disabling in roughly 2000, when she stopped working." AR 2595.

In July 2014, Plaintiff began seeing Ana Balzar, LCSW, on a monthly basis for mental health issues. AR 2602. Ms. Balzar completed a "Mental Disability Capacity Assessment" for Plaintiff on August 16, 2017, in which she stated her diagnoses of "PTSD, Bipolar Mood Disorder I" and noted her belief that the onset of these conditions occurred in October 2000. AR 2602-2604. Ms. Balzar noted her assessment of Plaintiff's ability to function as follows: "moderate" limitation on Plaintiff's ability to understand, remember, or apply information, and "marked extreme" limitations on Plaintiff's abilities to interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself. AR 2603. She assessed Plaintiff a Global Assessment of Functioning (GAF) score

of 40.[1]   AR 2602.

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:

The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":

• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of her or his many positive qualities. No symptoms."

• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."

• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."

• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."

• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."

• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."

• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent

## III.    Hearing Testimony

At the rescheduled hearing on December 4, 2017, Plaintiff (who appeared with counsel), the medical expert, Steven Goldstein, M.D., and a vocational expert, Cyndee Burnette, testified. AR 31-59. Following no objection from the Plaintiff, the ALJ began by questioning Dr. Goldstein, who had prepared notes from medical records outside of the disability period of December 2000 through December 31, 2005; the ALJ determined to allow Dr. Goldstein additional time to access and review the earlier records. AR 37-39.

The ALJ proceeded to question the Plaintiff, who testified that at the time of the hearing, she lived with a caregiver who had a full-time job at the VA; another caregiver "checked" on her; she did not drive unless it was necessary; in 2016, she was in a car accident in which she was stationary and sitting in the driver's seat; at the time of she was taking twenty-nine medications; and, during the day, while watching television, she would alternate between laying down and standing up. AR 40-42. With respect to the relevant disability period, Plaintiff testified that she had not worked since 2000; standing became "a little difficult"; a "battle buddy" Freda Davis cooked, cleaned, and drove for her; her "two major issues" were her back injury and migraines; she suffered from anxiety and paranoia and did not like "being around other people; and it was "difficult" to stand, sit, and lift. AR 42-45. When asked by her attorney, Plaintiff testified that as a pharmacy technician, it became difficult to deal with the public; she had a "hard time with men" and had "crazy flashbacks"; she had difficulty remembering the medications; she had difficulty walking up and down stairs; she was

inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

9

anxious about calling patients; and she called out sick from work "a lot."  AR 45-46.  Plaintiff also testified that she attended school "off and on" for "general studies at that time, but [she] didn't go" because she had to take the bus and she felt there were "too many people in close quarters."  AR 46-47.  For her physical impairments, Plaintiff attested that she took Ibuprofen for years that caused stomach pain; she also engaged in physical therapy and would lay down when she was in pain; and, she had three to four migraines per week lasting more than three hours each.  AR 47-50.

The ALJ proceeded to question Dr. Goldstein who listed the following impairments for the Plaintiff during the disability period: lumbar sprain, knee swelling, migraine headaches, and chronic diarrhea.  AR 51.  He opined that none of the impairments, separately or combined, met or equaled the Social Security Commissioner's medical listings, but the impairments caused functional limitations as follows: reduced to light level of activities; placed within five to ten minutes of a restroom; and, avoid all pulmonary irritants.  AR 51-53.  When asked by Plaintiff's attorney about the application of Listing 11.02 to the migraine headaches, Dr. Goldstein testified that only "complicated migraines" could fall under the listing and he saw nothing in the record indicating that Plaintiff suffered from such migraines.  AR 54-55.

The ALJ then turned to the vocational expert, Ms. Burnett, who testified that an individual with Plaintiff's age, experience and education for the period, 2000-2005, and the following limitations — "perform a full range of light capacities, except would need to be within five to ten minutes of a bathroom and could not be around pulmonary irritants, should have no interaction with the general public and occasional interaction with coworkers and supervisors" — could perform the jobs of "office helper," "mail room clerk," and  "routing clerk"; if the limitations were further

restricted to being "late or absent three times a month," all employment would be eliminated. AR 56-57. In answer to Plaintiff's attorney's questions, Ms. Burnette testified that the routing clerk and officer helper were listed at "reasoning level two," and the mail room clerk is at "reasoning level three"; and, all of these positions would be eliminated if the employee were "off task 25 percent of the time" or needed to lie down. AR 57-58.

The ALJ issued an unfavorable decision on December 21, 2017. AR 12-25.

## LEGAL STANDARDS

To qualify for benefits under sections 216(i) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA. 42 U.S.C. §§ 416(i), 423, 1382.

## I.    SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. § 404.1520. Step Two is a determination of whether the claimant has a medically severe impairment or combination of

impairments as governed by 20 C.F.R. § 404.1520(c). If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *Id.* Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. § 404.1520(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. § 404.1520(e), (f). Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work in the national economy in view of her age, education, and work experience. *See* 20 C.F.R. § 404.1520(g).

## II.    Standard of Review

The Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d

28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). In addition, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). But, in all cases, the Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

## ALJ's RULING

The ALJ ruled that Plaintiff did not engage in substantial gainful activity during the period from the alleged onset date of her disability, December 20, 2000, through her date last insured, December 31, 2005 (Step One). AR 17. Further, the ALJ determined that Plaintiff had the following severe impairments: chronic lumbar sprain/strain with right lower extremity radiculopathy; chronic pain syndrome; inflammatory bowel disease ("IBD"); and affective disorder (Step Two). *Id.* She found Plaintiff's other medically determinable impairments, including obstructive sleep apnea, posttraumatic stress disorder, and degenerative disc disease were not present in the record until after December 31, 2005, and the impairments of migraines/headaches and left knee pain were not "severe." AR 17-18. Next, the ALJ found the Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment

13

deemed to be so severe as to preclude substantial gainful employment (Step Three). AR 18-19.

The ALJ then determined that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) with the following restrictions: "she would have needed to be within five to 10 minutes of a bathroom; she could not have been around pulmonary irritants; she could not have had any interaction with the general public; and she could have had occasional interaction with coworkers and supervisors." AR 19.

The ALJ also found that Plaintiff had no past relevant work (Step Four), and there were jobs in the national economy that Plaintiff could have performed during the alleged disability period, such as "office helper," "routing clerk," and "mail room clerk." AR 23-24. As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 32]

Plaintiff sought review of the ALJ's decision by the Appeals Council in January 2018. *See* AR 7. On September 21, 2018, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security." AR 1-6. Plaintiff timely filed her Complaint in this matter on October 19, 2018.

### ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) whether the ALJ failed to properly weigh the opinion evidence and whether her conclusions were based on substantial evidence; (2) whether the ALJ erred in relying on an admittedly unprepared medical expert testifying outside of his area of expertise to determine the RFC; and (3) whether the ALJ committed reversible error in

failing to consider opinion evidence from an acceptable medical source.  Opening Br. 2.

## ANALYSIS

The Court will address each of the Plaintiff's issues in turn.

**I.     Whether ALJ Properly Weighed Opinion Evidence and Based Conclusions on Substantial Evidence**

Plaintiff argues that the ALJ "committed reversable error by giving more weight to a nontreating, non-examining physician's opinion and giving little weight to that of a treating physician. She further erred by failing to fully explain her rationale in departing from the regulations governing the weight to be assigned to treating, examining, and consulting medical experts." Opening Br. 26-27.  Specifically, Plaintiff asserts that the ALJ improperly gave more weight to Dr. Goldstein's opinion than to the opinion of Plaintiff's "treating" physician, Dr. D'Arcy.  *See id.*

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215 (citing 20 C.F.R. § 401.1527(d)).  The ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight he assigns to them." *Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (internal quotation marks omitted).  The applicable regulations governing the SSA's consideration of medical opinions distinguish among "treating" physicians, "examining" physicians, and "nonexamining" (or "consulting") physicians. *See* 20 C.F.R. § 416.927(c).

Here, the ALJ characterizes Dr. D'Arcy as a "treating" physician and, as such, the Plaintiff argues the ALJ should have given Dr. D'Arcy's opinion more (or the most) weight.  According to

the "treating physician rule," the Commissioner will generally "give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c)(2). In fact, "[a] treating physician's opinion must be given substantial weight unless good cause is shown to disregard it." *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th Cir. 1995). A treating physician's opinion is accorded this weight because of the unique perspective the doctor has to medical evidence that cannot be obtained from an objective medical finding alone or from reports of individual examinations. *See Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

When assessing how much weight to give a treating source opinion, the ALJ must complete a two-step inquiry, each step of which is analytically distinct. *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). The ALJ must first determine whether the opinion is conclusive – that is, whether it is to be accorded "controlling weight" on the matter to which it relates. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); *accord Krauser*, 638 F.3d at 1330. If the opinion is not supported by medically acceptable evidence, then the inquiry at this stage is complete. *Watkins*, 350 F.3d at 1300. However, if the ALJ "finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record ." *Id.* If not, the opinion is not entitled to controlling weight. *Id.* In contrast, if the medical opinion of a treating physician is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must give it controlling weight. *Sedlak v. Colvin*, No. 11-cv-01247-PAB, 2014 WL 717914, at *10 (D. Colo. Feb. 24, 2014) (citing 20 C.F.R. § 416.927(c)(2)).

16

If the opinion of a treating physician does not merit controlling weight or if there is no opinion by a treating physician, the ALJ must move to step two and consider the following factors in determining how to evaluate other medical opinions in the record: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations. *Id.* "An ALJ may dismiss or discount an opinion from a medical source only if her decision to do so is 'based on an evaluation of all of the factors set out in the cited regulations' and if she provides 'specific, legitimate reasons' for [the] rejection." *Id.* (quoting *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012)).

It is error for an ALJ not to adequately state and explain what weight she gives to medical opinions. *See Langley*, 373 F.3d at 1119. The ALJ must give "good reasons" for the weight she ultimately assigns each medical opinion. *Watkins*, 350 F.3d at 1301. The ALJ's decision must be sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, and the reason for that weight. *See Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). Even though an ALJ is not required to discuss every piece of evidence, it must be clear that the ALJ considered all of the evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "[I]n addition to discussing the evidence supporting her decision, the ALJ also must discuss the uncontroverted evidence she chooses not to rely upon, as well as significantly probative evidence she rejects." *Id.* at 1010. Boilerplate language, unconnected to any evidence in the record, will not suffice to support an ALJ's conclusion. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). An ALJ may reasonably give less weight to a medical opinion that differs from that same doctor's

notes.  *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th Cir. 2013).

Here, the Court finds that, despite the ALJ's and Plaintiff's characterizations, Dr. D'Arcy is not a treating physician entitled to "substantial" weight.  The record reflects that Plaintiff presented to NP Eric Rodgers in May 2000, months before she saw Dr. D'Arcy, for the specific reason of "establish[ing] a PCP."  AR 344-347.  Later records refer to Plaintiff's primary care provider as NP Rodgers (*see, e.g.,* AR 1353-1359) and the record shows that Plaintiff transferred from NP Rodgers to Dr. Brooks as her PCP in May 2005 (AR 1337-1342).  However, there is nothing in the record reflecting that Plaintiff presented to Dr. D'Arcy for more than the single C&P examination in August 2000.  Accordingly, the Court finds Dr. D'Arcy is an "examining" physician for purposes of its analysis in this case.

Following the C&P examination, on October 13, 2000, Dr. D'Arcy opined that Plaintiff was "unemployable. Her ability to walk, stand, sit, carry, lie down etc. is all severely limited to the extent to preclude employment. The lumbosacral problems are the cause of this severe functional limitation."  AR 333.  Plaintiff is correct that, for an examining physician's opinion, the ALJ must consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Bryant v. Commissioner*, 753 F. App'x 637, 640 (10th Cir. 2018) (quoting *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).  "The ALJ must consider 'all of the

factors set out in' the regulations, mindful that an examining source opinion 'is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record.'" *Id.* (quoting *Chapo*, 682 F.3d at 1291).

As pertinent here, the ALJ in this case found that

> . . . the medical evidence corresponding to the period from the alleged disability onset date of December 20, 2000 through her date last insured of December 31, 2005 documents infrequent treatment despite her access to VA care, only one complaint of lower back or leg pain, which was associated with a recent mechanical fall, no reports of any need for or use of an assistive device, rare endorsement of depression that mostly occurred following her mother's death, very few complaints associated with IBD, no significant abnormalities on physical or mental status exams, and regular reports of exercising, attending school, and volunteering for hospice. Thus, the medical evidence corresponding to the period from the alleged disability onset date through the claimant's date last insured of December 31, 2005 substantially fails to support the alleged severity of her symptoms and limitations. Instead, it significantly supports the opinion of the medical expert, Steven Goldstein, M.D. (see ex. 20F), indicating that during the period on and prior to the date last insured, the claimant was capable of light work activities except that she needed to have access to a restroom within five to 10 minutes of the workstation and had to avoid pulmonary irritants. He stated that he could not tell from the record whether the claimant would have needed to take more than regular breaks during the workday during that period.

> Dr. Goldstein's equivocation about the need for extra breaks is inconsistent with the medical evidence corresponding to the period at issue, which documents infrequent treatment, no significant exam abnormalities, and reports of substantially intact daily activities and abilities, none of which supports any need for extra breaks during that period. However, otherwise, his opinion is accorded significant weight because it is from an expert who is familiar with Social Security policy and who had the opportunity to review the medical evidence of record and it is consistent with the medical evidence corresponding to the period at issue in this decision. . . .

> The undersigned finds unpersuasive the October 2000 opinion of a treating physician, Genet D'Arcy, stating that the claimant was unemployable due to severely limited ability to sit, stand, walk, carry, and lie down (See ex. 2F at 11). That opinion is accorded very little weight because it was issued prior to the alleged onset of disability and it is markedly inconsistent with the medical evidence corresponding

> to the period at issue in this decision, which documents infrequent treatment despite the claimant's access to VA care, only one complaint of lower back or leg pain, which was associated with a recent mechanical fall, no reports of any need for or use of an assistive device, very few complaints associated with IBD, no significant abnormalities on physical exams, and regular reports of exercising, attending school, and volunteering for hospice.

AR 22-23. Plaintiff contends that the ALJ's opinion addressed only two factors, consistency and knowledge of agency policy, which is "insufficient because it does not address why Dr. Goldstein, a non-treating, non-examining physician . . . that specializes in neurology is opining on a musculoskeletal issue." Opening Br. 25. However, on the C&P Examination report, Dr. D'Arcy characterized herself as a "Neurology Consultant" (AR 1378); Plaintiff cannot reasonably argue that Dr. Goldstein is "unqualified" and, at the same time, assert that the ALJ should have accepted Dr. D'Arcy's opinion concerning her "lumbosacral problems."[2] Moreover, Plaintiff does not explain how the ALJ's consideration of the first two factors, both of which involve "treatment," would affect her decision; the record indicates that neither Dr. Goldstein nor Dr. D'Arcy engaged in any treatment of the Plaintiff.

With respect to the third and fourth factors–(3) degree to which an opinion is supported by relevant evidence and (4) consistency between the opinion and the record as a whole—Plaintiff argues the ALJ erred in noting that Dr. D'Arcy's opinion occurred prior to the disability onset date of December 20, 2000 because "it is closer in time to the period at issue than Dr. Goldberg's opinion and nothing in the medical records shows [Plaintiff's] condition improved after the C&P exam." Opening Br. 26. Even if the former were true, the latter is not wholly accurate. The relevant

---

[2] The Court notes that, although the ALJ provided her the opportunity to do so, Plaintiff did not object to Dr. Goldstein's qualifications to render an opinion at the hearing. AR 36.

medical evidence (as set forth above) reflects that, between August 2000 and May 2005, Plaintiff presented to health providers only for illness and well woman examinations. During this time, she reported that while she had a "back injury" and "migraine headaches," she sought no treatment for either condition, appeared "fit," and told her providers that she was exercising three times a week. In May 2005, Plaintiff presented to Dr. Brooks following a fall, complaining of "severe migraines," "back pain," "left knee pain," and "daily diarrhea"; however, the records that followed in June and November 2005 reflect Plaintiff's reports that she was going to "graduate from college this winter, then take MCAT this spring"; her "appetite [was] good"; she was "exercising on campus, feels she could exercise more"; her "left knee [was] 'ok'"; she was "sleeping thru migraine headaches - feels ok about this also"; and, the diarrhea "resolved on [its] own with diet changes." AR 1320-1326. There were no additional records before the date last insured of December 31, 2005.

Plaintiff also asserts the ALJ's finding that Dr. D'Arcy's opinion was inconsistent with her reports of "exercising, attending school, and volunteering for hospice" is "incorrect" because in August 2000, Plaintiff reported difficulty walking and, at the hearing, Plaintiff testified that she did not continue her hospice work because she had difficulty standing. Opening Br. 26. The Court disagrees. The ALJ correctly considered the medical record during the relevant period of December 2000 through December 2005 and noted Plaintiff's reports concerning school, exercise, and hospice work. In so considering, the ALJ found that the relevant medical evidence "substantially fails to support the alleged severity of [Plaintiff's] symptoms and limitations." AR 22.

The ALJ's finding that the record supports Dr. Goldstein's opinion that the Plaintiff could perform light work activities during the relevant time period considers the relevant regulatory factors

and is a "good" reason for assigning the opinion "significant weight." Likewise, the ALJ's finding

that Dr. D'Arcy's opinion was "markedly inconsistent with the medical evidence" is a "good" reason

for according the opinion "very little weight." Moreover, the ALJ found that the VA's ratings

(derived from opinions like Dr. D'Arcy's) were accorded "very little weight" because "they were

issued by a different agency with different standards for determining disability than those used by

the Social Security Administration." AR 23.

Therefore, the Court finds the ALJ did not err in weighing the challenged medical evidence

and in basing her conclusions on substantial evidence.

## II.     Whether the ALJ Erred in Relying on an "Unprepared Medical Expert" to Determine the RFC

Plaintiff contends that the ALJ improperly relied on Dr. Goldstein's opinion because he was

"unprepared" and his opinion did not "address the criteria under C.F.R. § 404.1527(a)(1)." Opening

Br. 27.

First, Plaintiff asserts that Dr. Goldstein was unprepared at the hearing because he admitted

to making "most of his notes on the later records," which post-dated the date last insured. *Id.* The

hearing transcript reflects that the ALJ allowed the doctor to review the record while the Plaintiff

was questioned by the ALJ and her own attorney. AR 39-40. Plaintiff argues this could not have

been sufficient time because "[t]he medical records in this case are voluminous" and Dr. Goldstein

"could not possibly have done a meaningful review of [the relevant] records in 20 or 30 minutes he

was allotted." Opening Br. 27. The Court disagrees.

It is undisputed by the parties that the relevant record consists of medical records dating from

2000 to 2005; yet, to ensure complete consideration, both the ALJ and this Court reviewed the record from 1999 to mid-2006. That record appears here in AR 1315-1390, a total of seventy-five pages. The Court reasonably concludes that a medical expert, particularly one having the experience of a forty-year career such as Dr. Goldstein, would be able to meaningfully review a seventy-five page medical record in twenty-to-thirty minutes. The Court is not convinced that Dr. Goldstein was "unprepared" to give an opinion in this case.

Plaintiff also contends that Dr. Goldstein's testimony regarding Plaintiff's "lumbar problem was speculative." Opening Br. 28. Dr. Goldstein testified that a "lumbar problem is usually progressive. If it was there in the earlier period (referring to the alleged disability period), it wouldn't be as severe." AR 38. Plaintiff asserts that the doctor did not change his analysis after his review of the relevant record; however, as set forth above, the record is devoid of evidence that Plaintiff complained about or sought treatment for her back until May 2005 after she fell; thereafter, she did not seek treatment for her back. Such evidence appears to support, rather than contravene, Dr. Goldstein's opinion.

Plaintiff also asserts that Dr. Goldstein's limitation of pulmonary irritants was neither supported nor indicated by the record, and his "testimony does not address whether the limitation is related to the claimant's smoking or the later-diagnosed sarcoidosis." Opening Br. 28. The Court finds otherwise; Dr. Goldstein testified that "smoking" was an impairment during the relevant time and that sarcoidosis was not. AR 51. Accordingly, the limitation from pulmonary irritants reasonably arises from the smoking impairment.

Plaintiff contends that "Dr. Goldstein's evaluation did not consider [Plaintiff's] sleep

disturbance related to her migraines[;] therefore his opinion did not adequately address the symptoms, diagnosis, or prognosis, as required under C.F.R. § 404.1527(a)(1)." Opening Br. 28. Plaintiff points to two records: the first is AR 1377, which was part of the C&P Examination report prepared by Dr. D'Arcy in August 2000, prior to the onset date. The second record is AR 1322, which reflects Dr. Brooks' follow-up examination of the Plaintiff in November 2005 in which the doctor noted under Assessment/Plan, "sleep disorder/migraine headaches: disliked trazodone. feels depression an issue but declines [treatment] for now." Plaintiff argues, based on this record, that "[h]er headaches affected her sleep and Trazodone did not help." Opening Br. 28. The Court is not convinced; in the same record, Plaintiff reported, "sleeping thru migraine headaches - feels ok about this also." AR 1320.

Finally, Plaintiff asserts that Dr. Goldstein's "opinion that chronic diarrhea affects the claimant only in her need for restroom proximity does not adequately consider the symptoms, diagnosis or prognosis of her condition." Opening Br. 28. The Court finds this unsupported assertion to be merely speculative; the record reflects that the doctor considered, but could not discern from the record, whether Plaintiff needed more than regularly, scheduled breaks during a work day for her bowel condition. AR 53. The ALJ then determined after review of the record that any "extra" breaks were not needed during that period. AR 22.

The Court finds the ALJ did not err in relying on Dr. Goldstein's opinion to determine the RFC.

## III. Whether the ALJ Erred in Failing to Consider Dr. Wachtel's Opinion

Plaintiff contends that "the ALJ committed reversable [sic] error by failing to even identify Dr. Wachtel's opinion and for rejecting it categorically without further explanation." Opening Br. 29. The Court agrees.

Max Wachtel, PhD., a psychologist, examined Plaintiff on July 19, 2017 and opined that Plaintiff's mental "condition became disabling in roughly 2000, when she stopped working." AR 2595. As Plaintiff points out, the ALJ did not mention Dr. Wachtel in her decision; rather, she summarily "accord[ed] no weight" to Dr. Wachtel's and "other medical opinions" because "they were issued several years after the date last insured of December 31, 2005 and are not supported by the medical evidence corresponding to that period and discussed above." AR 23. Unlike her analysis of Dr. D'Arcy's opinion, the ALJ failed to address the factors necessary to determine the weight properly accorded to Dr. Wachtel's opinion. *See Bryant*, 753 F. App'x at 640 ("The ALJ must consider 'all of the factors set out in' the regulations, mindful that an examining source opinion 'is presumptively entitled to more weight than a doctor's opinion derived from a review of the medical record.'"). Without such analysis, the ALJ's opinion is not "sufficiently specific to make clear to any subsequent reviewer the weight given to the medical opinion, *and the reason for that weight*." *See Oldham*, 509 F.3d at 1258 (emphasis added). The Court cannot discern whether the ALJ properly identified an "affective disorder" as one of Plaintiff's impairments based on substantial evidence and whether the RFC properly accounted for any mental impairment.

Accordingly, the Court finds it must remand the decision to the ALJ for a proper analysis of Dr. Wachtel's opinion. *Quintero v. Colvin*, 567 F. App'x 616, 621 (10th Cir. 2014) ("We note the Commissioner attempts to rehabilitate the ALJ's decision by offering belated justifications for the

weight assigned to the opinions, but the problems cannot be fixed on appeal and must be repaired by the ALJ on remand."); *Kellams v. Berryhill*, 696 F. App'x 909, 920 (10th Cir. 2017) (remand to the agency was necessary to allow the Commissioner to properly evaluate relevant medical source opinions).

<u>**CONCLUSION**</u>

In sum, the Court concludes that, while the ALJ did not fail to properly weigh the medical opinions concerning Plaintiff's physical impairments, she failed to properly analyze and weigh the opinion of psychologist Max Wachtel, Ph.D. and, thus, the Court cannot discern whether the ALJ properly formulated the RFC in this case. Accordingly, the decision of the ALJ that Plaintiff Katherine Washington was not disabled since December 20, 2000 is AFFIRMED IN PART as to Plaintiff's physical impairments, REVERSED IN PART as to Plaintiff's mental impairment(s), if any, and REMANDED to the Commissioner for further consideration in accordance with this order.

Dated at Denver, Colorado this 10th day of January, 2020.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge